CHARLES W. SLAGLE, JR., ET AL., TRUSTEES, *vs.* J. WATERS RUSSELL.

*Real Estate Broker Not Entitled to Commissions When He is Interested in the Purchase Made—Sufficiency of Evidence to Show That Broker Was the Procuring Cause of Sale—Sale by Owner Not Aware That Purchaser Had Been Procured by Broker—Employment of Two Brokers—Lapse of Time as Affecting Broker's Authority—Revocation of Employment.*

A real estate broker employed to sell land who has himself an interest in the purchase is not entitled to recover commissions on such a sale unless the vendor knew that the broker was purchasing in part for himself and assented to the arrangement. The duty of the broker as agent of the vendor is to obtain the highest price and his personal interest as a purchaser is to buy at the lowest price. He cannot be allowed compensation for his services in effecting a sale when there is such a conflict between his duty as an agent and his personal interest as purchaser.

Plaintiff sued to recover commissions on the sale by defendants
of a farm to one C. The defendants did not know at the
time that C. had been procured as a purchaser by the plain-
tiff. Some months before the sale, the defendants had author-
ized plaintiff to obtain an offer for the property. Plaintiff's
evidence was that he had first called C.'s attention to the
farm and asked him to buy it, and afterwards said that if C.
so wished he would unite with him in making the purchase.
The defendant's evidence was that the plaintiff's proposition
to C. was that they should buy the farm together, and that
this was not agreed to by C., who some time afterwards
bought the farm directly from the defendants. *Held,* that,
assuming that the plaintiff was the procuring cause of the
sale, if it be found as a fact by the jury that the plaintiff
called C.'s attention to the farm by the proposition that they
should buy the same on joint account, the plaintiff is no
more entitled to commissions on the sale afterwards made
to C. alone than he would be if the sale had been made to
them jointly.

*Held,* further, that the evidence in the case is legally sufficient
to show that plaintiff's proposition to C. was not essentially
that they should become joint purchasers, and also to show
that the plaintiff was the procuring cause of the sale after-
wards made, and that these questions should have been sub-
mitted to the jury under instructions in connection with the
defendant's evidence.

If a broker who has been authorized to obtain a purchaser for
land is the procuring cause of the sale afterwards made be-
cause he first called the attention of the purchaser to the
property, he is entitled to commissions on the sale, although
the vendor did not know that the purchaser to whom he sold
had been procured by the efforts of the broker.

If the owner of the land has employed two brokers and one of
them produces a purchaser, and the owner, having no knowl-
edge or notice that the other broker really procured that
purchaser, pays in good faith the commissions to the one so
producing him, he will not be required to pay commissions
also to the other broker.

When a broker empowered to sell a farm becomes the procuring cause of a sale made five months after his employment, the offer to him will not be held, as matter of law, to have lapsed by efflux of time, so that his acceptance, by performing the services contemplated, comes too late to make a contract entitling him to commissions.

After negotiations begun through a broker's intervention have virtually culminated in a sale, he cannot be discharged so as to deprive him of his commissions when he was thus the procuring cause of the sale made.

*Decided January 11th, 1911.*

Appeal from the Superior Court of Baltimore City (SHARP, J.).

*Defendants' Third Prayer.*—That under the pleadings and evidence in this case, the jury are not entitled to take into consideration any alleged interviews or verbal agreements or understandings between the plaintiff and the defendants, prior to the letter of January 27, 1909, from plaintiff to defendants. (*Refused.*)

*Defendants' Seventh Prayer.*—Even if the jury find that the plaintiff called the attention of Mr. Cacy to the property and suggested to him, or requested him to purchase it, and even if Cacy took the matter under consideration yet if Cacy finally told the plaintiff that he, Cacy, could not buy, or did not want to buy, and that the negotiations with Cacy were *bona fide* broken off and abandoned, then under the pleadings in the case the plaintiff is not entitled to recover, even if they find that subsequently Cacy on his own account, and under other influences, opened negotiations with the defendants, which resulted in the sale of the property. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Randolph Barton, Jr.,* and *Aubrey Pearre, Jr.,* for the appellants.

*Clarence W. Perkins* (with whom was *Chas. P. Coady* on the brief), for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellee recovered a judgment against the appellants for commissions on a sale of real estate of which he claims to be the procuring cause. He was a licensed real estate broker in Kent County, and called upon Mr. C. W. Slagle in Baltimore the latter part of December, 1908, or the early part of January, 1909, and told him he thought he could find a buyer for the farm held in trust by the appellants. He testified that he told Mr. Slagle that if he was able to find a buyer, his commission would be five per cent., and that "his answer was, 'you go ahead and offer it to your prospective buyers and sell it if you can,' and with that understanding after that conversation, I left his office. Mr. Slagle said they wanted $20,000 for it. Witness said he thought that was a little high but might be obtained, and Slagle said: 'You make me a proposition for it,' which I afterwards did, his instructions were 'whatever offer you get, submit it to me.' "

On cross-examination he stated he had written on January 27th, 1909, the following letter: "Referring to our conversation regarding farm now occupied by Mr. Hudson, and situate near Gales, will you kindly advise me if you care to sell, as I am in communication with one of my customers who might be interested in this place." To which he received the following reply, dated January 29th, 1909: "In reply to your favor of the 27th will say we will sell the farm situated on Worton Creek, containing about 516 acres, at the rate of $38 per acre, subject to the tenants' rights." He said he had no other written agreement with Mr. Slagle, and did not see him personally or have any other communication, either

verbal or written, with the Slagle estate, or its representatives, until the end of June, 1909.

Mr. W. H. Cacy of Kent County got a verbal option from Mr. Slagle, for the purchase of the property at $17,000, in June, 1909, and on the 28th of that month obtained an option in writing, at which time he paid $250.00. Shortly afterwards Mr. Baukhages told Mr. Cacy he was authorized by Mrs. Costello to offer him $1,000 advance. He declined that but finally sold it to her for $23,000, before he got his deed, which is dated September 7th, 1909. It is shown by uncontradicted evidence that the appellants did not know Mrs. Costello in connection with the sale, and Mr. Cacy testified that when he obtained the option he did not know there were such people living as Mrs. Costello and Mr. Baukhages, but the latter afterwards came to him—having been told by Mr. Slagle that he had agreed to sell the farm to Mr. Cacy. He (Mr. Cacy) paid Mr. Baukhages' commissions on this sale to Mrs. Costello.

Mr. Russell contends that he was instrumental in procuring Mr. Cacy as a purchaser and hence is entitled to commissions. Mr. Slagle testified that he did not know that Mr. Russell had ever spoken to Mr. Cacy on the subject, that he had heard nothing whatever from him since January, and never thought of him in connection with the sale. He had not given him an exclusive right to sell, and we do not understand it to be contended that he did not act in perfectly good faith. On June 26, 1909, which was after the verbal option was given by Mr. Slagle to Mr. Cacy, Mr. Russell wrote to the estate of Charles W. Slagle as follows: "About one week ago I wrote you about your Gales Wharf Farm. Will you kindly advise me your lowest cash price, or lowest price for the whole tract, and at what figure would you name for the wharf and the farm tilled by Mr. Hudson. Thanking you for an early reply, I am," etc. He received the following reply, which is dated in the record July 29, but is admitted to have been written on June 29, 1909, "In reply to your

letter of the 26th, would say that we have not received the letter within the last week of which you speak. We would also state that as the whole of Worton Manor Beach Farm is now practically sold we cannot name you a price on any part of it at present."

On July 1st, 1909, Mr. Russell wrote the following letter: "Yours of the 29th at hand. Acting upon our conversation of last spring, together with your letter of several months ago, I submitted your farm to a Mrs. Costello and a Mr. Baukhages of Baltimore, should they be the purchasers to whom you refer, I would expect a commission from the sale, and I write to this effect so that you may not enter into a contract until we clearly understand just what your and my relations are. Of course it is possible that these parties are not considering the purchase, if so, my assumption is inapplicable."

On July 3rd he called up Mr. Slagle by telephone and Mr. Slagle told him that he had sold the farm to Mr. Cacy. On the same day Mr. Russell wrote a letter addressed to the Estate of Charles W. Slagle in which he referred to the conversation with Mr. C. W. Slagle about the first of January, 1909, and to the letters of January 27th and January 29th. He said in this letter that, "In Jan., 1909, I, at Massey Sta., Kent Co., submitted this farm to W. H. Cacy, of Massey, during April, 1909, in Chestertown I again approached Mr. Cacy about this farm, and about three weeks ago, I again talked with him," and he claimed commissions on the sale to Mr. Cacy. In his testimony he said he had some business with Mr. Cacy the latter part of January, and he spoke of the farm to him. He told him they were asking $20,000 for it. He said "he would consider it, and that was all he said." He saw him again about the first of April, and spoke of it. Cacy said the price was too high, but they talked it over and he told him he thought less than $20,000 would buy it. Then about the last of April he saw him again, and told him he had talked with others, and he thought it was worth the

money, and insisted upon his further consideration of it. Cacy said he thought the price was a little high and the buildings needed some repairs, but "Well, he said, I will think it over." He did not see Cacy after that, but he was trying to sell the property to different parties. Mr. Russell admitted that he did not make any new proposition in April—"no more than a repetition of my arguments. Same thing in interview in latter part of April in Chestertown."

Cacy testified that when he met Russell about Christmas, 1908, or the first of January, 1909, "Mr. Russell said Worton Manor Farm could be bought, and he said, I will buy it with you, and I think we can make some money on it." He told him he would go with him to look at it. He was asked: "Q. Did he say anything at that interview about your buying it and his not buying it? A. No, sir; not a thing. His proposal was he buy it with me. Q. Is your mind clear on that? A. Yes, sir. Q. That he buy it with you? A. Yes." He said he did not go to see it then, and the next thing that occurred about it was that he met Mr. Russell, he thought in February or March, but was not positive about the date, when "He simply said what about that Worton Manor Beach Farm, you have not been to look at it.' I said, 'I will go with you to look at it some time." That was about the substance of what was said. Witness did not go to look at it then. 'Well, I saw Mr. Russell again in Chestertown, I think it was in April, and he mentioned the matter, and I said, Waters I haven't the money, and I gave it up.' At the third interview, Russell said, 'What about the Worton Manor Farm?' 'Well, I said, Waters, I haven't any money, and you will have to count me out.' Meanwhile witness had done nothing about the farm, or been to look at it."

He further testified that some time in June he saw Mr. Perkins (one of the counsel for the plaintiff) on the train and he said if he (Cacy) would buy it he (Perkins) would buy a portion of it, or 50 acres of the farm. He went to

Baltimore, saw Mr. Slagle, and got the option the latter part of June.

Inasmuch as the appellants relied largely on what they claim to have been error in rejecting the sixth and eighth prayers, we will consider them before taking up the other questions involved in this case. The sixth is as follows: "If the jury believe from the evidence that at no time did plaintiff propose to William H. Cacy that he, said Cacy, should buy defendants' farm, but that his proposal always was that plaintiff and Cacy should buy it together, then even if the jury further believe that the purchase of defendants' farm by Cacy was the direct result of the said proposals of the plaintiff, yet under the pleadings and evidence in the case the plaintiff is not entitled to recover." The eighth prayer is: "The defendants pray the Court to instruct the jury that if they find that whenever the plaintiff suggested to Mr. Cacy the purchase of the property in question, it was always with the proposal that he, the plaintiff, and the said Cacy should purchase it together, and at no time with any other proposal, and that plan of purchasing was not known to the defendants, then under the pleadings in the case the plaintiff cannot recover."

The appellee contends that there was not sufficient evidence to support those prayers, and hence they were properly refused, but we think there was unquestionably evidence tending to show that Mr. Russell's proposition to Mr. Cacy was that they should buy the property together. In addition to what we have stated above, Mr. Russell admits that he "knew that Cacy was not a farmer, buying for farm purposes, but as a rule invested in farm properties for the purpose of selling." He further said, "As a matter of fact, I advised Mr. Cacy to buy the farm, thinking it was a good proposition for him to invest in, and urging him, to the extent of telling him, that if he wanted me to, I would go in with him. I did that to strengthen his judgment and opinion as to the value of the farm"—although he also said in answer to the ques-

tion, "So your proposition really was, then, to Mr. Cacy, that you would go in with him and buy this farm?" "No, my primary proposition was for him to buy it. I opened the subject up that way. The second proposition was, if he wanted me to, I would go into it." Mr. Cacy testified, as stated above, and there can be no doubt that according to his evidence, Mr. Russell's proposition to him was that they should buy it together, and Mr. Russell, to some extent, corroborated him. It was, therefore, a question for the jury and those prayers left it to them.

What then is the effect of that action, if Mr. Cacy's theory of what was done is correct? In *Raisin* v. *Clark,* 41 Md. 158, the appellant was employed by the owner to sell for him a farm in Baltimore County and appellee, seeing the advertisement, called upon the appellant and proposed to exchange a house she owned in the city for the farm, which exchange was effected. The owner paid the appellant the usual commissions, and he sued the appellee to recover like commissions from her. This Court affirmed the judgment denying his right to recover, and, in the course of the opinion, JUDGE MILLER said: "It is a general rule that a party cannot in any agency of this kind act as agent or broker for both vendor and vendee in respect to the same transaction, because in such case there is a necessary conflict between his interest and his duty. The vendor in the employment of an agent to sell his property bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit.

"It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of the principal as far as he lawfully may. The seller of an estate is presumed to be desirous of selling it at as high a price as can fairly be obtained for it, and the purchaser is equally presumed to desire to purchase it for as low a price as he may. The interests of the two are in conflict * * * Hence the law will not permit an agent of the vendor whilst that employment continues, to assume the essentially inconsistent and

repugnant relation of agent for the purchaser." Again he said: "It is perhaps possible for the same agent to serve both parties to such a transaction honestly and faithfully, but it is very difficult to do so, and the temptation to do otherwise is so strong that the law has wisely interposed a positive prohibition to every such attempt."

In *Blake* v. *Stump,* 72 Md. 172, this Court said: "The principle asserted by the eighth prayer of the defendant is that a broker cannot act for both seller and purchaser without the full knowledge and consent of each, because their interests are in conflict. That is undeniably the law, and has been maintained by this Court, most positively in *Schwartze* v. *Yearly,* 31 Md. 271, and *Raisin* v. *Clark,* 41 Md. 159." The eighth prayer spoken of in that opinion was to the effect, that if the jury believed that the plaintiffs were employed by the defendant to effect the sale in question, and that prior to the commencement of the negotiations the purchaser had employed them to procure the property, and the plaintiff in pursuance of that employment commenced to treat with the defendant for the purchase of the property; or if they believed that at any time whilst the plaintiffs were in the employ of the defendants they were in respect to the purchase and sale in any way in the employ or acting as agent of or in the interest of the purchaser, then the plaintiffs were not entitled to recover. That was an action for the recovery of commissions on the theory that the plaintiffs' introduction of the purchaser had been the procuring cause of the sale, and the principle involved in that prayer was very analogous to that in these now under consideration. For if a broker employed by the owner cannot be agent of the purchaser, surely he cannot be the purchaser himself. It is scarcely necessary to cite authorities to that effect, but in 19 *Cyc.* 206, it is said: "Unless the principal is fully advised of the facts, a broker employed to buy property cannot as a rule sell property in which he has an individual interest; nor may a broker employed to sell property become the buyer thereof."

It would be difficult to find a decision in one case more applicable to another than that of *Blake* v. *Stump* to the one one now before us. It was not only a similar suit, but a defense of the same character was made in that case as is made here. The appellee claims to have been the procuring cause of the sale to Cacy, but if it be true that he brought the farm to Cacy's attention (which resulted in his purchase of it) by his effort to induce Cacy to purchase it with him, he cannot be permitted to recover commissions under the principle above announced. It is true that Cacy did not buy it for the appellee and himself, but, if his testimony is correct, the only negotiations the appellee had with him were those in which he had such a personal interest as to preclude him from recovering from the appellants commissions for services rendered them in bringing Cacy to them. The appellee was endeavoring to persuade Cacy to join him in the purchase on the theory that they could make profit out of it by reselling it. He told Cacy the price named by the appellants was $20,000, but that it was possible he could get some reduction on it. As he was the agent of the appellants, it was his duty not only to get $20,000 for it, if he could, but to get *all* he could for it, while, if he was to be the purchaser for the whole or only a part his interest was to get it as low as possible. There would therefore be a great conflict between his duty as agent and his interest as purchaser. The law will not permit an agent to be thus tempted, and refuses to reward him for services claimed to have been rendered under such circumstances, unless the owner is made to clearly understand and give his consent to such conditions.

In justice to Mr. Russell it may be said that if Mr. Cacy had consented to join with him and purchase the property, he might have told the appellants that he had an interest in the purchase, or before closing the sale might have obtained their consent to become a purchaser, but the transaction did not go so far as to raise that question. The appellants might or might not have consented to it, but it is not contended that

they did so consent, or knew that the appellee was negotiating with Cacy to purchase it either for himself or with the appellee. Assuming that Cacy's testimony is correct on this point, which we must do in passing on these prayers, and assuming, as the appellee claims, that Cacy became a purchaser through his instrumentality, the fact is that Cacy's attention was brought to the property by reason of the appellee's negotiations with him, which negotiations were based on his, the appellee's, becoming a co-purchaser. If they had resulted in a purchase by or for the two, then unquestionably he would not only not have been entitled to commissions but would have been liable to the appellants for a breach of duty. Suppose for example he and Cacy had purchased the property under those circumstances for $17,000 and then had sold it in a few weeks to Mrs. Costello for $23,000, as Cacy did, can it be doubted that the appellants could, on discovering that the appellee had an interest in the purchase, have held him liable? So if it be conceded that the appellee was a procuring cause of the sale, it was the result of such action on his part as the law condemns, and he is in no better position to claim commissions on the sale to Cacy, who was thus brought into the transaction, than he would have been if he and Cacy had become joint purchasers. In order that there be no misunderstanding we repeat what we have in substance intimated, that we do not mean to say that such were the negatiations in fact, as that is for the jury, but only that there was evidence of it, which we, for the purposes of these prayers, must assume to be correct.

The only criticism we would make on the sixth prayer is that it did not, as the eighth did, submit to the jury to find whether the appellants knew of the plan proposed by the appellee to Cacy, but as it is not pretended that they did, or that they had given their consent to it, the appellee could not have been injured by submitting the prayer without such qualification. We are, therefore, of the opinion that there was error in rejecting those two prayers.

As the Court granted the defendants' seventh prayer, we do not think there was reversible error in rejecting the fourth—especially as Mr. Cacy did not say in terms that his conversation with Mr. Perkins was the inducing cause of his purchase. Possibly such an inference might be drawn from what he did say, but as he never mentioned the subject to Mr. Perkins after he did purchase, and as his talk with Mr. Perkins might simply have resulted in causing him to take more prompt action, than Mr. Russell's negotiations had induced him to do, there is not much in the record to found even such an inference upon.

The defendants' special exceptions to the plaintiff's prayers, and the defendants' first and second prayers can be considered together. They are on the theory that there was no legally sufficient evidence to prove that the plaintiff was the procuring cause of the sale. Although such a defense was not relied on by the appellants, we deem it proper to here refer to what seems to be a misapprehension on the part of some as to the law of this State. In *Quist* v. *Goodfellow*, 90 Minn. 509, which is also reported in 9 *Am. & Eng. An. Cases*, 431, and in 8 *L. R. A. N. S.* 153, it is said: "Some of the authorities hold that a real estate broker is entitled to his stipulated commission where his efforts were in fact the procuring cause of a sale, though made by the owner in good faith and in ignorance of his efforts; but such is not the law of this State. To entitle the broker to a commission in such case, where there is no exclusive agency, it must appear that the owner knew, or from the circumstances ought to have known, that the broker was instrumental in inducing the purchaser to enter into the contract. Such was the rule laid down in *Cathcart* v. *Bacon*, 47 Minn. 34, 49 N. W. Rep. 331; and it is the law in other States." That learned Court then refers to several decisions, amongst others, *Tinges* v. *Moale*, 25 Md. 480. In the note in 9 *Am. & Eng. An. Cases*, the author says that the great weight of authority is to the contrary—that "It is generally held that it is suf-

ficient if it appears that the broker was the procuring cause of the sale." He then refers to a large number of cases, and concludes that part of the note by saying: "Some Courts, however, have held that a broker is not entitled to a commission on a sale made by the owner to one with whom the broker has negotiated, if the owner acts in good faith and without knowledge of the negotiations between the broker and such purchaser." He then cites several cases, including *Tinges* v. *Moale.*

We will not refer to the other cases cited in the opinion or that note, but we do deem it proper to correct the misapprehension as to the law in this State. In *Tinges* v. *Moale,* the statement which has doubtless caused the misapprehension was made where there were two brokers, and the sale was made by the owner to a purchaser procured by one of them, and the purchaser paid the commissions to the one broker, and not as in this case where there was no conflict between brokers and where the owner had not paid the commissions to anyone. Immediately following the quotation from the lower Court, which our predecessors held to be a correct exposition of the law, and which we assume caused the misapprehension, JUDGE WEISEL, in speaking for the Court, said: "If there be but one broker employed, he can with safety withhold the name of the purchaser until the sale shall have been made. But as the employment of one broker does not preclude the employment of another to procure a purchaser for the same property, it becomes, therefore, the duty of the broker who procures one, and who looks to the security of his commissions, to report the name and offer to his principal, that the latter may be notified in time and thus put upon his guard before he pays the commissions to either." If an owner has employed two brokers, and one of them produces a purchaser, and the owner does not know, and has no reason to believe, that the other really procured the purchaser, and pays in good faith the commissions to the one so producing him, he ought not be required to pay

the other also—thereby paying double commissions,—but where, as in this case, the owner deals with the purchaser— not as one produced or sent by another broker, and does not pay anyone commissions—if a broker who was employed by the owner was in point of fact the procuring cause, he ought not be deprived of his commission merely because the owner did not know that he had procured him. In this case the purchaser and the broker lived in the county where the farm lies, and if the appellants wanted to protect themselves from paying commissions, they might have first communicated with the appellee. They had not revoked his agency, and while five months had expired since they had heard from the appellee, they had not inquired of him as to what he was doing, had placed no limit on the time of the agency, so far as the record discloses, and we cannot say, as a matter of law, under the circumstances, that a period of five months was an unreasonable time.

In *Livezy* v. *Miller,* 61 Md. 343, it was said: "It is well settled by the authorities generally, and in this State, that a broker is entitled to his commissions if the sale effected can be referred to his instrumentality. It is also the established law that, after negotiations, begun through a broker's inter- vention, have virtually culminated in a sale, the agent can- not be discharged, so as to deprive him of his commissions. If the agent is the *procuring cause* of the sale made, he will be awarded his commissions." *Tinges* v. *Moale* is there cited, together with other Maryland cases, and as no reference was made to any contrary doctrine being announced by it, it is clear that it was not supposed by the Court, when *Livezy* v. *Miller* was decided, that *Tinges* v. *Moale* was contrary to the doctrine then announced, that "If the agent is the pro- curing cause of the sale made he will be awarded his com- missions." Whether the agent was the procuring cause of the sale is the question upon which the right to commissions generally depends. *Blake* v. *Stump, supra; Hallyday* v.

*Southern Agency,* 100 Md. 294; *Walker* v. *Baldwin,* 106 Md. 634; *Martin* v. *Baltimore City,* 109 Md. 260.

It is clear then that the appellants could not rely on the doctrine announced in *Quist* v. *Goodfellow,* on the theory that *Tinges* v. *Moale* was in accord with it, as the latter case cannot be held to have adopted that doctrine as applicable to such facts as we have before us, and, if it had, would not be in line with the later decisions of this Court. As we have already indicated the appellants did not so contend, but as in our investigation of the subject we found that *Tinges* v. *Moale* had been so understood by such high authority we thought it proper to correct the erroneous impression.

Without deeming it necessary to enter upon a discussion as to what may be deemed a "procuring cause," as the cases above cited and others in this State have sufficiently considered that question to relieve us of again doing so, we are not prepared to say that there was no evidence, legally sufficient, tending to show that the appellee was the procuring cause of this sale. There are some facts and circumstances which tend to show that he was and others that tend to show the contrary. It is therefore, for the jury to determine, with appropriate instructions by the Court. In view of what we have said, in considering the sixth and eighth prayers of the defendants, we are of the opinion that the plaintiff's prayers ought to have been so qualified as to submit the questions presented by them, and we think there was error in not so qualifying them, either in the prayers themselves, or by appropriate reference to the defendants' prayers, which we have said ought to have been granted, but we cannot hold there is no evidence legally sufficient to show that the plaintiff was the procuring cause of the sale, if the jury adopts the plaintiff's theory of what took place between him and Cacy. The defendants' special exceptions were properly overruled and their first and second prayers properly rejected.

Their third prayer was also properly rejected, as the letters of January 27th and 29th did not attempt to name all

the terms of the employment, especially as to the commissions to be allowed. The letter of January 27th began by saying, "Referring to our conversation," etc.

We see no reversible error in the other exceptions. In the first place by reason of the defendants' fifth prayer, which was granted, those rulings could do no harm, but, in addition to that, without giving other reasons, what was admitted under the questions embraced in those exceptions tended to show the plaintiff had not abandoned the employment, but was still acting under it when the sale was made.

For errors in granting the plaintiff's two prayers (without such qualifications as we have spoken of), and in rejecting the sixth and eighth of the defendants, the judgment must be reversed.

*Judgment reversed and new trial awarded, the appellee to pay the costs, above and below.*