J. C. M. LUCAS AND H. P. LUCAS, CO-PARTNERS TRAD-
ING AS J. C. M. LUCAS COMPANY, *vs.* WILLIAM
P. CRENSHAW,, FRANCIS K. CAREY
AND JAMES PIPER, THE TWO LATTER
CO-PARTNERS.

*Brokers or agents: employment; breaking off and renewing
negotiations; commissions.*

A party can not act as agent or broker for both vendor and
vendee in respect to the same transaction.          p. 465

Certain parties associated together were to share commissions
as agents or brokers in an employment that was, however,
dropped and brought to a definite termination before the com-
missions were earned; certain of the parties rendered services
and earned compensation upon a new, separate and distinct
employment representing different interests, in which some
of those first associated with them were not included, although
the services related to the same subject-matter. *Held,* that in
the absence of evidence to show an agreement that those of
the former associates who were not included in the new trans-
actions were, by the original agreement, to have been included
in any subsequent employment concerning the same subject-
matter as to which the others might be employed, no action
for money had and received would lie by them against those
of their former associates who were employed in the second
transaction.          p. 466

*Decided November 15th, 1911.*

Apppeal from the Baltimore City Court (DOBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Alexander Preston* (with whom were *Wm. L. Marbury* and *Carter Lee Bowie* on the brief), for the appellants.

*Albert C. Ritchie* (with whom was *Stuart S. Janney* on the brief), for the appellees.

URNER, J., delivered the opinion of the Court.

In the summer of 1908 the Roanoke Railway and Electric Company acquired the property and franchises of the Roanoke Water Power Company by the purchase of its entire capital stock.   The appellees, Carey and Piper, received from the vendee company $25,750 as compensation for their services in negotiating the sale.   They paid to the appellee Crenshaw, who was associated with them in the transaction, $5,000, as his share of the commissions.   The appellants claim that they also were interested with the appellees in the brokerage project in which the commissions were earned, and that they are entitled to a due proportion of the fund.   They seek recovery in this suit, under a count for money had and received, upon the principle, applied in *Mills* v. *Bailey,* 88 Md. 320, and other analogous cases, that such an action "lies to recover money in the possession of the defendant which in justice and conscience belongs to the plaintiffs," and "that where *ex aequo et bono* money ought to be paid a promise to pay it would be implied."

The only bill of exceptions in the record relates to the ruling of the Court below in refusing to submit the issue of fact to the jury and in directing a verdict for the defendants, and the sole question before us, therefore, is whether the evidence is legally sufficient to support the theory of the appellants' case.

It appears that in August, 1906, the appellants were employed by William N. Camp, the owner of practically all of the capital stock of the Roanoke Water Power Company, to obtain a loan upon an issue of the company's bonds or to effect a sale of its property.   The appellants engaged the appellee Crenshaw to co-operate with them in the matter

with the understanding that he should have active charge of the negotiations and should account to them for one-half of the commissions. There was no express agreement with Mr. Camp in regard to the compensation to be paid for the services to be thus rendered. His understanding, according to his testimony, was that the appellants might have as commissions any excess realized over the price he might fix for the property or the bonds. Shortly after the business had been placed in the hands of Mr. Crenshaw it was submitted by him to Herbert R. Stimpson, with whom he was associated in other matters, and the latter, after looking into the subject, recommended the appellees Carey and Piper as being in a position to aid in accomplishing the desired result. Crenshaw and Stimpson accordingly saw Mr. Piper, of the firm just mentioned, and after they had explained the situation to him so far as their information extended, they all went together to the appellants' office to obtain further details as to the plant and resources of the company they were to represent. This was in December, 1906. In the meantime J. C. M. Lucas, one of the appellants, had been in further communication with Camp on the subject, and had gone to Roanoke, Virginia, for the purpose of familiarizing himself with the company's property. The specific proposition presented to Piper was "to place one hundred and fifty thousand dollars of the bonds of the Roanoke Water Company." His advice was that the transaction take the form of a loan to be secured by a pledge of the bonds as collateral. This method was adopted, and it was understood that the effort should be to obtain $125,000 upon the security indicated. On December 11, 1906, in a letter to Crenshaw suggesting the plan mentioned, together with an alternative one, and asking for certain data to be used in the negotiations, Piper stated: "If either one of the above plans is adopted, and you will authorize me to go ahead, I will be very glad to do so with the understanding that we are to be paid a commission of five per cent. on the amount of money actually procured— one-half of which is to come to me and one-half to you and

your associates." In response to this letter, which was forwarded by Crenshaw to Camp, the desired information was furnished and the suggestion that the bonds be pledged for a loan was accepted. There were subsequent conferences in which Piper, Crenshaw and Lucas participated.

The business was actively prosecuted by Piper, and on December 7th Crenshaw telegraphed Camp that the loan had been arranged "subject to examination and approval of engineer and Roanoke lawyer at borrower's expense, and five per cent. commission to us." In reply Camp wired Crenshaw to "hold all matters in abeyance until I see you next week." This was answered on the following day by Crenshaw who expressed surprise at Camp's telegram and advised him that the lender was not willing to hold the transaction open and that it would have to be taken up as a new proposition on Camp's arrival in Baltimore. The Mercantile Trust Company was the institution from which the loan was to have been procured.

There were no further developments until Camp came to Baltimore on the 9th or 10th of January, 1907, and met Piper, Crenshaw and Lucas at the latter's office. At this conference the idea, which had been suggested in earlier interviews, of effecting a consolidation of Camp's Company with the Roanoke Railway and Lighting Company, his only competitor in the production and sale of electricity, was further discussed, and it was agreed that a plan for accomplishing that object should be prepared by Piper and submitted at another meeting to be held on January 11, 1911. In pursuance of this appointment the four gentlemen met and considered a plan of consolidation which Piper submitted in the form of a letter addressed to Camp. It is in evidence that during this interview Camp said that if the deal were carried through Lucas was to have an interest in the commissions. It was understood that Piper should proceed with the consolidation project if some negotiations then being conducted by Camp's son with representatives of the rival company in Philadelphia should be found not to have reached

the stage of a definite agreement. On January 16th Camp wrote Crenshaw advising him that his son had "practically made a deal with the other people." Previously an examination and report had been made by a consulting engineer to the Mercantile Trust and Deposit Company at the instance of Piper, who had procured this to be done upon the assumption that the plan of consolidation which he had suggested was to be carried into effect and who intended to avail himself of the services of the Trust Company in that connection. In view of this situation Crenshaw wired Camp on January 17th asking to be advised immediately as to the full particulars of his son's deal "in order to avoid misunderstanding with Piper and Mercantile Trust."

On January 28th, nothing further having been heard from Camp, Piper wrote Crenshaw a letter in which he reviewed the negotiations to that time and complained of Camp's abandonment of the loan transaction, when all the arrangement had been made for its consummation, and of his continuing to negotiate directly with the Philadelphia representatives of the competing company, contrary to the agreement reached at the interview of January 11th. This letter was forwarded to Camp by Crenshaw, enclosed in one from the latter in which he also gave expression to his dissatisfaction with Camp's attitude and claimed that commissions had been earned on the $125,000 loan. At this time Mr. Camp was in Florida. The letters just referred to were forwarded to him from Roanoke. On February 9th he came to Baltimore and wrote a letter addressed to Crenshaw authorizing him and Piper to proceed with the attempt to effect a consolidation of the two companies. This was written at the appellant's office. It was shown by Camp in person to Piper, but as the result of a quarrel which then occurred on account of negotiations which Camp was charged with having carried on independently for the same purpose, each of these gentlemen declared that he would never have any further dealings with the other, and their relations were then finally discontinued.

The appellants do not appear to have heard of this rupture until about the first of April, 1908, when J. C. M. Lucas was told of it in an interview with Piper, to which we will again refer; but they took no further action themselves in the matter, and after March 1st, 1907, did not hear from Crenshaw on the subject. The latter wrote Camp on April 16, 1907, asking to be advised whether he required "any financing now or in the near future," to which Camp replied that he had made his financial arrangement for the present.

About a year later Piper met J. C. M. Lucas at the Merchants' Club, and the interview to which we have already alluded then occurred. Piper inquired about Camp and his Roanoke enterprise and Lucas stated that Camp was well and his company was prospering. He said that Camp did not see how the rival company could continue its electric lighting business very well in view of his successful competition. In the course of the conversation Piper asked: "Do you think there is a chance of re-opening the negotiations again?" to which Lucas replied: "Yes, I think there is. Mr. Camp would be perfectly willing to sell out at a fair price." Piper said that he did not know whether he could take the subject up again with Camp as they were on bad terms, and Lucas thereupon suggested: "I can take this up if you would like me to because I stand in very well with Mr. Camp; we are very friendly." "Well," said Piper, "if you do, we will have to take Crenshaw back into the negotiations."

On April 20, 1908, Crenshaw wrote Camp: "It has been a long time since I had the pleasure of hearing from you or seeing you. Things seem to be getting a little bit better here, and it may be that in the event that you may wish to do so, something now might be done with the Roanoke property. If you have in mind making any disposition of the property, I will be glad to hear from you as to what your views are." In his reply dated April 25, 1908, Camp said: "I would like to sell the Roanoke Water Power Company bonds if I could get ninety cents on the dollar for them. If

you think that you can get this price I would like to take the matter up with you." These letters opened a correspondence upon the question of the sale of the bonds which continued to June 1st, 1908.

The letters from Crenshaw to Camp during this period were written at the suggestion of Carey and Piper. It appears from Piper's testimony that he and his partner were then considering the idea of making a proposal to the Roanoke Railway and Lighting Company to represent it in an effort to purchase the property and franchises of the company controlled by Mr. Camp and that he suggested the inquiry contained in Crenshaw's letter to Camp for the purpose of learning whether the latter had actually made his financial arrangements as reported a year previously, becuse if he had done so it would be worth while to enter upon the new venture.

Sometime in May, 1908, Carey and Piper opened communications with the Philadelphia representatives of the Roanoke Railway and Lighting Company. They proposed that the company employ them to buy the property of its competitor or to purchase its bonds with an option on the stock. An agreement being reached as to their employment for that purpose, Mr. Carey on May 28th drafted a letter setting forth the terms upon which they were to conduct the business, which were summarized in part as follows: "We are to open negotiations, through one of the Baltimore Trust Companies, based upon the negotiations now pending between Mr. Camp and Mr. Crenshaw, for the purchase, from the Roanoke Water Power Company, of its issue of first mortgage bonds, which Mr. Camp has authorized Mr. Grenshaw to sell. * * * In the course of these negotiations we will endeavor to obtain through the Trust Company a proposition from Mr. Camp for the absolute sale of his water power interest for a cash sum; and if we can obtain such a proposition we are to submit it to you for your consideration. * * * If we are able to obtain a proposition from Mr. Camp and his associates, either for the sale of his bonds with a

stock option, or for the sale of his entire water power interest, or for a merger of the two properties, which is accepted by yourself and your associates, we are to receive from the Roanoke Railway and Electric Company, or from yourself and your associates, the sum of $25,000 in cash for our services for conducting these negotiations." The letter refers also to a retainer of $750 as having been agreed upon and which the evidence shows was forthwith paid. It was stated that the trust company to be selected by the appellee firm to aid them in their negotiations would receive $250 of the retainer and $2,500 of the commissions, and that Mr. Crenshaw would also be compensated out of the latter fund. Before the letter was mailed it was submitted to Crenshaw. He assented to the arrangement it described and agreed to co-operate with Carey and Piper in carrying it into effect for a compensation of $5,000, to be paid him out of the commissions if earned.

On the following day Crenshaw, at the instance of Carey, wrote Camp that the Mercantile Trust Company was interested in the matter of purchasing his company's bonds and asked whether the Trust Company would be permitted to send its expert accountant and its counsel to Roanoke to make an examination of the Power Company's books and to investigate the legal features of the situation. It is explained in Mr. Carey's testimony that the Trust Company was taken into the transaction because the identity of the prospective purchaser could thus be more readily concealed. He stated that such concealment was desirable because it was understood that Mr. Camp was opposed to selling out to the rival company. From this time Carey had exclusive control of the negotiations. The evidence shows that Crenshaw had no connection with the matter after writing his letter to Camp of May 29th. In reply to this letter Camp wrote on June 1st consenting to the proposed investigation and mentioning a time when he could meet the Trust Company's representatives. Its expert accountant and Mr. Carey, in the capacity of its counsel, accordingly went to Roanoke and

met Mr. Camp at the Power Company's offices. Before the
examiantion of the books was begun Carey stated that he
was not there for the purpose of buying the bonds unless he
could at the same time get control of the stock by option or
in some other way. Camp replied that he would not give any
option on his stock, but if Carey had a responsible person to
buy the property he would take up the question of selling it
outright. Carey said that the Mercantile Trust Company
represented an interest that was able to make the purchase.

Leaving the expert accountant to examine the books,
Carey and Camp then drove out to inspect the company's
power plant. During this trip, which occupied the greater
part of the day, negotiations were carried on constantly in
reference to the sale of the property. Camp first offered to
sell for $1,000,000, but the price was finally reduced, after
much discussion, to $750,000, and a ten-day option to the
trust company to purchase on that basis was executed. The
option recited that it was given to the trust company at the
request of Mr. Carey as its counsel. This was on June 9th.
A few days later, after the expert accountant's report had
been sent to the trust company, and by it forwarded to the
Roanoke Railway and Lighting Company in Philadelphia, a
conference was held in that city at the latter company's
offices, at which Carey was present, when the option obtained
by him from Camp was discussed. The company's officers
concluded, in view of the accountant's report, that $500,000
was the highest price they would be willing to pay. At the
conclusion of the meeting Carey went to New York, where
he had an appointment with Camp for that day, and after a
long negotiation succeeded in persuading him to reduce his
price for the property to $650,000. Returning to Philadel-
phia, Mr. Carey submitted this amended offer to his client,
and a sale was finally effected substantially on the basis of
the last-mentioned proposition. The stipulated commis-
sion of $25,000 was then in due course paid by the vendee
company to Carey and Piper, and they, in accordance with

the agreements previously mentioned, remitted $5,000 to Crenshaw and $2,500 to the Mercantile Trust Company.

The appellants were entirely unaware of these negotiations until they were informed by Camp about June 13th, 1908, that Crenshaw had reopened the matter with him, and that he had given Carey, as the representative of the trust company, an option for the purchase of the power company's stock. Upon receiving this information the appellants wrote Crenshaw that they had learned of his negotiations for the sale of Mr. Camp's property at Roanoke, and stating: "We presume that you still intend handling this matter on the terms of our original understanding, as this matter was first brought to your attention by us. If this sale is consummated we will look for our share of the commissions." No reply was received to this letter, but the appellants later had an interview with Crenshaw in which he disputed any interest on their part in the transaction. He stated, however, that he could not say what he would do until he saw Mr. Carey, who was then absent from the city. Nothing further having been heard from Crenshaw on the subject, the appellant made another demand upon him by letter on July 23rd, 1908, and this was followed by the present suit.

There is some conflict in the testimony upon the question as to whether Carey and Piper knew that the appellants were associated with Crenshaw in the original undertaking to make for Mr. Camp the financial arrangements which he then had in view. But it is apparent from our statement of the case that there was evidence from which the jury might have found that the appellants' interest in the commissions to be earned in that transaction was understood by all the parties to the present suit.

The theory upon which the appellants base their claim to a share of the compensation which the appellees received is that the negotiations which resulted in the sale were merely a continuance or resumption of those conducted at Mr. Camp's instance and for his benefit. It is, of course, conceded that the position of the negotiators was completely

reversed with respect to the source from which their compensation was to be derived, but it is insisted that the situation as between the parties to this action nevertheless remained unchanged, and that as the appellants had created the opportunity for earning the commissions which were eventually paid, they are *ex æquo et bono* entitled to share in the fund. We have been unable to accept this view of the case, and we concur in the conclusion of the learned Court below that, according to the uncontradicted evidence, the employment under which the purchase occurred was entirely distinct from that in which the appellants and appellees were associated more than a year previously. The only rational inference to be drawn from the facts is that the projects undertaken at the instance of Mr. Camp were abandoned in the spring of 1907. There is nothing in the record to indicate that from this time forward the appellants manifested any interest in the matter until they were informed, about fourteen months later, that an option to purchase had been given to Mr. Carey as the representative of the Mercantile Trust Company. It does not appear that they ever contemplated any further negotiations on behalf of Mr. Camp upon their own initiative. In fact, they were manifestly without authority to do so, in view of his explicit statement in his letter of April 18, 1907, that he did not require such services. Nothing was done by the appellants in consequence of Piper's inquiries in April, 1908, and the correspondence later conducted by Crenshaw with Camp at the request of Carey and Piper was merely preliminary to the negotiations which they contemplated opening as the representatives of an opposing interest. The employment under which the commissions were actually earned was wholly inconsistent with that in which the abandoned undertaking had originated. This Court has declared it to be "a general rule that a party can not in any agency of this kind act as agent or broker for both vendor and vendee in respect to the same transaction, because in such case there is a necessary conflict between his interest and his duty." *Raisin* v. *Clark*, 41 Md. 158; *Slagle* v. *Rus-*

*sell,* 114 Md. 426; *Blake* v. *Stump,* 73 Md. 172; *Schwartze,* v. *Yearly,* 31 Md. 271. In the earlier negotiations the parties to this suit were under a common obligation to act exclusively for Mr. Camp's advantage, while the service for which the appellees received, under a different employment, the compensation in which the appellants seek to share was rendered in direct antagonism to the interest first represented. In view of this radical change in the relations of the parties and of the long period of inactivity which intervened between the two engagements, the appellants' theory as to the continuity of the negotiations is obviously untenable.

The case, therefore, is simply one in which the appellees, having been associated with the appellants under an employment which came to a definite termination, have since rendered services and earned compensation under a separate and distinct employment in which the appellants were not included. In such a situation, and in the absence of any evidence to show an agreement that, regardless of the abandonment of the first undertaking, the appellants should be taken into any new transactions in relation to the same subject-matter in which the appellees might become interested at any subsequent time as the representatives of a different interest, we are required to hold that there is no ground upon which the present suit can be maintained.

The judgment of the Court below will accordingly be affirmed.

*Judgment affirmed, with costs.*